| | | |
|---|---|---|
| **BRANCH BANKING AND TRUST COMPANY,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **No. 3:11-00301** |
| | ) | **Judge Sharp** |
| **FIDELITY NATIONAL TITLE INSURANCE COMPANY, 1ST TRUST TITLE, INC.; AND DELAINA THOMPSON,** | ) ) ) ) | |
| | ) | |
| **Defendants.** | ) | |

## MEMORANDUM

D. Mark Lineberry wanted to build a hotel and was not going to let the little matter of a $4 million encumbrance on the property get in the way of a $19 million loan. So he instructed his employee to hoodwink the new lender into believing the encumbrance had been paid off, when it had not. The main question presented by this litigation, and the subject of Cross-Motions for Summary Judgment (Docket Nos. 63, 71 & 75), is whether the title insurer, Defendant Fidelity National Title Insurance Company ("Fidelity"), is liable (beyond the terms of the contract) to the lender, Branch Bank and Trust ("BB&T"), for the fraud perpetrated by Lineberry.

## I. FACTUAL BACKGROUND[1]

In 2008, BB&T agreed to loan 315 Union Street Holdings, LLC and Union Street Plaza Operations, LLC (collectively "the Borrowers") some $18.7 million, so that a building on the

---

[1] The background facts are drawn primarily from BB&T's and Fidelity's Statement of Facts (Docket No. 100) that was filed in anticipation of a scheduled bench trial. The Court continued the trial, pending this ruling on the cross-motions for summary judgment.

property at 315 Union Street in Nashville could be converted into a hotel. At the time, there existed a deed of trust encumbering the property in favor of Prudential Mortgage Capital Company, LLC. in the amount of $4,082,978.26.

Lineberry was, for all intents and purposes, the owner and manager of the Union Street properties. He was also the President of 1st Title Trust. Defendant Delaina Thompson was Vice President of 1st Title Trust. At closing, it was represented that the Prudential loan had been paid off, when, in fact, it had not; as a result, BB&T found that it was not the first lienholder on the property. Prior to setting forth the facts which led to this result, it is appropriate to discuss briefly the relationship between 1st Trust and Fidelity.

1st Trust was a title agent (or policy issuing agent) in the State of Tennessee for Fidelity pursuant to an Issuing Agency Contract dated May 16, 2007. Specifically, in Paragraph 1 of the Agency Contract, 1st Trust was appointed "as a policy issuing agent of Principal for the sole purpose of issuing title insurance commitments, endorsements and other title assurances approved by Principal[.]" (Docket No. 63-2 at 60). In that capacity, 1st Trust was responsible (and Fidelity relied on it) for title searches, issuing title policies and endorsements, and maintaining title files. 1st Trust received compensation for its services as an agent for Fidelity by retaining 75% of the title insurance premium charged in connection with the issuance of a Fidelity title policy.

The Issuing Agency Contract also listed both the duties of, and the limitations on, the agent. Most pertinent here, paragraph 4J of the Agreement specifically provided that "Agent is not an agent of Principal for purposes of conducting a Closing," with closing defined in Paragraph 7H as "the handling and disbursement of settlement funds or the providing of settlement services." (Id. at 61-62). However, paragraph 4J went on to provide that

because Principal may be subject to allegations of liability for acts of Agent with regard to Agent's settlement or escrow business, Agent shall cooperate with Principal in the performance of audits of Agent's escrow records, accounts and procedures. In addition, Agent agrees to provide to Principal, within thirty (30) days following receipt, a copy of any audit conducted by any accounting firm with respect to Agent's escrow records, accounts or procedures.

(Id. at 61).

The Issuing Agent Contract also listed the duties of agents in relation to closing. Paragraph 4G provided:

G. In those instance where Agent closes real estate transactions and receives and disburses funds of others, Agent shall:

(i) maintain said funds safely in accounts fully insured by an agency of the Federal Government and in accordance with applicable state law;
(ii) maintain separate from Agent's personal or operating accounts all funds received by Agent from any source in connection with transaction(s) in which Principal's title insurance is involved;
(iii) disburse such funds only for the purposes for which they were entrusted;
(iv) maintain an escrow ledger for each title insurance order involving fiduciary funds, which ledger shall separately reflect the escrow activity for each order;
(v) maintain a control account showing total fiduciary liability for each escrow bank account; and
(vi) reconcile monthly the control account and ledger records to the monthly bank statement.

Principal shall have the right to examine, audit and approve Agent's accounting procedures to assure compliance with Principal's Escrow Accounting Manual, a copy of which is being delivered to Agent simultaneously with the execution of this Contract.

(Id.). Agents like 1st Trust were required to comply with "all bulletins, manuals and other instructions furnished to Agent in writing," and cooperate with Fidelity in audits of the agent's escrow records, accounts, and procedures.

Periodically, Fidelity audited agents to make certain that they were complying with the

3

requirements of Paragraph 4G.  However, such audits were internal and solely for the benefit of

Fidelity's management.  While Agents such as 1st Trust could be terminated for failing to comply

with the escrow accounting standards required by Fidelity, Fidelity had no contractual right to take

over any part of 1st Trust's business or take control of any escrow account.

The parties agree that the majority of title insurance agents in Tennessee not only write title

insurance policies, but also close loans.  Indeed, the the "Escrow Accounting Standards for Agents"

issued by Fidelity in connection with the Issuing Agency Contract conceded such a possibility, by

observing:

> Title insurance agents provide services that reflect the unique nature of real estate
> transactions.  Services provided vary from one area of the country to another and
> may include acting as escrow agent, obtaining releases, and conducting the actual
> closing or settlement.  However, the essential purpose is the same, i.e., to assist the
> parties in real estate transactions by insuring that the acquistion or transfer of
> property interest can be effected with a maximum degree of efficiency, security and
> safety.

(Docket No. 100 at 7).[2]

Returning to the narrative, on March 21, 2008, BB&T issued in favor of 315 Union Street

Holdings, LLC a Commitment Letter under which BB&T agreed to loan the borrowers the lesser

of $20 million or 70% of the appraised value of the property.[3]   The collateral for the loan was the

---

[2]  The parties note that Fidelity maintains a national website that contains, on its homepage, the statement:  "[t]hrough its nationwide network of direct operations and agents, [Fidelity] provides title insurance, underwriting, escrow and closing services to residential, commercial and industrial clients, lenders, developers, attorneys, real estate professionals and consumers."  https://www.fntic.com (last visited Dec. 27, 2013).  The homepage also contains an office locator that, when clicked for Tennessee, shows only Fidelity escrow offices staffed by Fidelity employees.  Fidelity's Central and East Tennessee offices also maintains its own website, but that website does not address the question of whether title agents conduct closings and settlements on behalf of Fidelity.

[3]  The parties refer to the loan transaction in the Commitment Letter and as closed as the "BB&T Loan."  The Court will do likewise.

property, and BB&T was to have a first priority lien on the property.

On July 14, 2008, John Boykin, an attorney representing BB&T, sent Lineberry an email which attached a Preliminary Loan Closing Checklist. Among other things, the letter asked Lineberry to disclose, "what Title Company will be used to issue the Bank's Mortgagee Title Commitment, and provide . . . contact information for the applicable office of the Title Company or Title Agent." (Docket No. 67-3). Lineberry, in turn, forwarded the e-mail to Thompson, who Boykin understood to be an employee, officer and agent of 1st Trust.

In response to Boykin, Thompson wrote, "I will be issuing the mortgage title policy for BBandT as requested by the borrower."[4]   (Docket No. 66-3 at 2). She also attached a title commitment for Boykin's review. From that e-mail and the hard copy transmittal of the documents, Boykin understood that 1st Trust was the "title agent" and Fidelity was the "title company" 1st Trust represented.

A commitment to issue title insurance was issued by 1st Trust as the duly authorized agent of Fidelity, and, on August 12, 2008, Fidelity approved the issuance of a loan title policy covered by the commitment to issue title insurance.[5] At the time of the issuance of the commitment, Fidelity, through its agent 1st Trust, was aware of the outstanding Prudential Deed of Trust. A marked-up title commitment, which BB&T possessed at least as of August 15, 2008 (and prior to closing) indicated

---

[4]  The e-mail identified Thompson as "Vice President" of 1st Trust Title.

[5]  The parties agree that "commitments to issue title insurance are issued prior to the closing, to set out matters as they exist before the closing and before new documents are recorded." (Docket No. 100 at 9). They also agree that "[c]ommitments to issue title insurance are issued to list what will or what will not be insured in the title policy itself, setting out such information as the type of policy to be issued, the holder of the estate to be insured, the property being insured, the policy coverage amounts, as well as requirements that must be met before a final policy may be issued, and exceptions or matters affecting the title that will appear in the final policy when it is issued." Id.

that "[p]ending disbursement of the full proceeds of the loan secured by the mortgage described i[n] Schedule A, this Policy insures only to the extent of the amount actually disbursed, but increases as each disbursement is made in good faith and without knowledge of any defects in or objections to title, up to the face amount of the Policy. Nothing contained in this paragraph limits any exception or any printed provision of this Policy." (Id. at 10).

In connection with the closing of the BB&T Loan, Brooke Parris, another attorney working for BB&T, provided 1st Trust with an "Escrow Closing Instruction Letter" dated August 28, 2010. That letter was addressed to Thompson as Vice President of 1st Title and required that 1st Title confirm in writing to counsel its receipt of the "Borrower's Remaining Equity Requirement" prior to funding by BB&T. The Closing Statement agreed upon by the parties (and incorporated into the Escrow Closing Letter) showed 1st Title as the disbursement agent for the loan and showed the "Borrower's Remaining Equity Requirement" to be the sum of $5,176,507.0, the bulk of which ($4,082,978.26) was the payoff amount on the Prudential Deed of Trust.[6] Thompson executed the Closing Instruction Letter, and, in so doing, represented that the Prudential Loan would be paid off prior to disbursement of the loan proceeds.

1st Trust acted as both the disbursement and escrow agent for the BB&T loan. BB&T provided funds in the amount of $4,151,220.98 to be delivered to 1st Trust to be disbursed pursuant to the terms of the Escrow Instruction Letter and the Closing Statement. It also provided for an additional $93,516.00 to be disbursed directly by BB&T in connection with the closing, making a total initial disbursement by BB&T of $4,244,736.98. The Loan Closing Statement also provided that the Borrowers contribute $5,176,507.00 (the Remaining Equity) to pay off and satisfy the prior

_____

[6] This Deed of Trust was then held by (and shown in the closing documents) as Wachovia Securities.

trust deeds encumbering the Property.

On the day of closing, August 29, 2008, Thompson emailed Boykin, stating 1st Title "ha[d] received the $5,176,507.00." Later that same day, Thompson emailed Brooke (with a copy to Boykin) that "wire have [sic] been rec'd in the amount of $4,151,200.98. Runner is being sent to record documents." (Docket No. 67-11 at 2). Both emails were untrue, as the Borrowers (read: Lineberry and his partners) did not have sufficient funds to close the loan. Nevertheless, 1st Trust closed the BB&T Loan on August 29, 2008, without funds sufficient to pay off the Prudential trust deed. As a result of the closing, BB&T received a Deed of Trust, Security Agreement, and Fixture Filing each recorded on August 29, 2008 securing $18,700,000.00 (the "BB&T Deed of Trust").

After closing, Fidelity executed and delivered a title insurance policy to BB&T ("the BB&T Policy") insuring the BB&T Deed of Trust was in first priority position, subject to no other prior liens or encumbrances, and without exception for the Prudential Deed of Trust. Prior to the issuance of the title policy, Fidelity was unaware that the Prudential trust deed remained an encumbrance on the property senior to the BB&T trust deed.

Beginning on October 16, 2008, BB&T provided post-closing funding to the Borrowers under the BB&T Loan. From that date until April 21, 2009, BB&T provided $8,398,003.20 to the Borrowers.

Thereafter, BB&T provided further funding after receiving Date Down Endorsements from Fidelity that were issued as a part of the BB&T policy.[7] Date Down Endorsements were issued effective (1) April 23, 2009, after which BB&T provided funding to the Borrowers in the amount

---

[7] The parties agree that "[e]ach Date Down Endorsement is an endorsement that the initial title search has been brought down from the date of the last title examination, to see any additional matters found in the public record," reflects "the status of the title of the Property" as of the effective date, and "relates back to the original date of the title policy and is subject to the terms of the title policy" (Docket No. 100 at 14-15).

of $1,867,027.45; (2) July 21, 2009, after which BB&T provided funding to the Borrowers in the amount of $1,109,808.35; and (3) October 12, 2009, after which BB&T provided funding to the Borrowers in the amount of $2,866,075.59.

Each of the Date Down Endorsements expressly stated:

"This endorsement is issued as part of the policy [issued to BB&T]. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

(Docket No. 67-13). None of the Endorsements reflected that the Prudential trust deed remained outstanding as an encumbrance on the property affecting the priority of the BB&T Trust Deed insured by the BB&T Policy.

On October 1, 2010, the Borrowers defaulted on the loan. BB&T applied $1,053,531.18 in principal reductions/repayments against the principal amounts previously advanced, leaving $17,546,659.31 due on the BB&T Loan.

BB&T sold the BB&T Loan to TN Nashville, LLC, receiving $12,350,000.[8] BB&T suffered a net loss of $5,196,659.31 on the loan. On September 29, 2011 (after this suit was filed), Fidelity satisfied the Prudential trust deed in full by paying $4,157,777.69.

Based upon the foregoing, BB&T filed a seven-count complaint in this Court. In Count One, BB&T seeks a declaration that (1) it is entitled to coverage under the Title Policy and (2) the Prudential Deed of Trust should be paid off. Counts Two and Three contain claims for fraud and misrepresentation. Counts Four and Seven are breach-of-contract claims. Count Five alleges

---

[8] The sales price was $12,500,000, $150,000 of which was reimbursed as a real estate commission.

violations of the Tennessee Consumer Protection Act.  Count Six alleges negligent misrepresentation.

## II.  <u>APPLICATION OF LAW</u>

### A.  <u>Motions to Strike</u>

Fidelity moves to strike the affidavits of Boykin, Robert Male, and Kevin Crow, which BB&T filed in support of is Motion for Summary Judgment.  Common themes in the Motions to Strike are  that the affidavits are not based upon personal knowledge, they contain inadmissible hearsay and speculation, and present arguments and legal conclusions.

Motions to strike are governed by Rule 12(f) of the Federal Rules of Civil Procedure, which specifically contemplates striking "immaterial, impertinent, or scandalous matter" from pleadings. Fed. R. Civ. P. 12(f).  The Motion for Summary Judgment and Memorandum in support of it are not pleadings, nor do the affidavits contain the type of material contemplated by Rule 12(f).  <u>See</u>, <u>Fox v. Mich. State Police Dept.</u>, 173 F. App'x 372, 375 (6th Cir. 2006) ("Exhibits attached to a dispositive motion are not 'pleadings' within the meaning of Fed. R. Civ. P. 7(a) and are therefore not subject to a motion to strike under Rule 12(f)"); <u>Polite v. Dougherty Cnty. Sch. Sys.</u>,  314 F. App'x. 180, 184 n.7 (11th Cir. 2008) ("But motions to strike are only appropriately addressed towards matters contained in the pleadings; here, the affidavit was submitted as part of the motion for summary judgment, which is not a pleading.").

Moreover, motions to strike are generally disfavored and, rather than striking material, a court may ignore inadmissible evidence.  <u>See</u>, <u>Dunavant v. Frito Lay</u>, 2013 WL 816673 at *5 (M.D. Tenn. Mar. 5, 2013);  <u>LuJan v. Southwest Airlines Co.</u>, 2008 WL 4791490 at *6 (M.D. Tenn. Oct. 28, 2008) (noting that motions to strike are disfavored, but considering plaintiff's affidavit only to

the extent that it was based on personal knowledge, set forth facts which would otherwise be admissible in evidence, and did not directly contradict prior deposition testimony); Berry v. Frank's Auto Body Carstar, Inc., 817 F. Supp.2d 1037, 1041–42 (S.D. Ohio 2011) (footnote omitted) ("But motions to strike are disfavored; a Court should ignore inadmissible evidence instead of striking it from the record"). That is the approach the Court takes in this case and considers the Boykin, Male, and Crow affidavits only to the extent that they are based upon personal knowledge and set forth facts which would otherwise be admissible as required by Federal Rule of Civil Procedure 56(c)(4).

**B. Motions for Summary Judgment**

"The standard of review for cross-motions for summary judgment does not differ from the standard applied when a motion is filed by only one party to the litigation." Ferro Corp. v. Cookson Group, PLC, 585 F.3d 946, 949 (6th Cir. 2009). A party may obtain summary judgment if the evidence establishes there are no genuine issues of material fact for trial and the moving party is entitled to judgment as a matter of law. See Fed. R. Civ. P. 56(c); Covington v. Knox County School Sys., 205 F.3d 912, 914 (6th Cir. 2000). A genuine issue exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, 477 U.S. 242, 248 (1986). In ruling on a motion for summary judgment, the Court must construe the evidence in the light most favorable to the nonmoving party, drawing all justifiable inferences in his or her favor. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

BB&T divides its motion into three categories: (1) claims arising from the Title Policy and the handling of the claim made by BB&T thereunder (the First, Fifth and Seventh Causes of Action); (2) claims against Fidelity and 1st Trust arising from 1st Trust's actions as the disbursing agent for which Fidelity is asserted to be liable on agency theories (the Third and Fourth Causes of Action);

and (3) claims directly against Fidelity for Fraud and Misrepresentation (the Second and Sixth Causes of Action). The Court will utilize those same categories in ruling on the pending Motions for Summary Judgment.

### 1. Claims Arising From the Title Policy and Handling of the Claim (First, Fifth and Seventh Causes of Action)

Fidelity moves for summary judgment on these claims because it paid the Prudential Deed of Trust in full. In response, BB&T concedes that the "First, Fifth and Seventh Causes of Action and the claims made therein have been paid and counsel have agreed to the dismissal thereof[.]" (Docket No. 80 at 1). Accordingly, "Fidelity's Motion for Summary Judgment on the Contract Claims" (Docket No. 75) will be granted.

### 2. Claims Against Fidelity Arising From 1st Trust's Action as Disbursing Agent (Third and Fourth Causes of Action)

In the Third Cause of Action, BB&T seeks to hold Fidelity liable because Thompson falsely informed BB&T that the Borrower's Equity Requirement had been received at the time of closing. Similarly, the Fourth Cause of Action, seeks to hold Fidelity liable because Thompson, on behalf of 1st Trust, agreed to follow the Escrow Instructions Letter that required all prior liens be paid, but did not do so. The validity of these claims hinge upon 1st Trust being Fidelity's agent. Based upon the evidence presented, the Court concludes BB&T has failed to establish that agency relationship.

"Generally speaking, Tennessee common law recognizes two types of authority in which the legal consequences of an agent's actions can be attributed to the principal and an agency relationship is created: actual and apparent authority." Farmer v. South Parkway Assoc., LP, 2013 WL 5424653 at *5 (Tenn. Ct. App. Sept. 25, 2013). "Actual authority may take the form of express authority or may be implied if 'given implicitly by the principal to his agent . . . or inferred from a course of

11

dealing between the alleged principal and the agent.'" Id. (quoting Bells Banking Co. v. Jackson Ctr., Inc., 938 S.W.2d 421, 424 (Tenn. Ct. App. 1996)).   "Apparent authority on the other hand is the power held by the putative agent 'to affect a principal's legal relations with third parties when a third party reasonably believes the [putative agent] has authority to act on behalf of the principal and that belief is traceable to the principal's manifestations.'" Id. (quoting Barbee v. Kindred Healthcare Operating, Inc., 2008 WL 4615858, at *6 (Tenn. Ct. App.  Oct. 20, 2008)).

There is no dispute that under the Issuing Agency Contract, Fidelity specifically appointed 1st Trust as its actual agent to search titles, and issue title policies and title commitment letters.  The same cannot be said about matters relating to closings and escrow; still BB&T seeks to hold Fidelity accountable for 1st Title's misdeeds relating to closing on the basis of general agency and apparent authority principles.

"It is . . . the settled law of this State that a general agent is authorized to act within the apparent scope of his authority, though they may be different from his actual powers." O'Shea v. First Fed. Sav. & Loan Ass'n, 405 S.W.2d 180, 183 (Tenn. 1966).   "Thus, [a] general agent appointed to transact business on the principal's behalf will usually possess the authority to carry out those acts which are commensurate to his position," and "while an agent's authority may be limited by the direction of his principal, if the other party to the contract is not made aware of that limitation, he may nevertheless rely on the agent's apparent authority to take those actions which are commensurate with his position." Gale Smith & Co. v. Governors Club, LLC, 2002 WL 31094849 at * 3 (Tenn. Ct. App. Sept. 20, 2002).

"The basic framework of 'apparent agency' is well known and logically follows its title – i.e., the authority the agent appears to have." BellSouth Advertising Corp. v. Primary Residential

Mortgage Corp., 2008 WL 624846 at *3 (Tenn. Ct. App. Mar. 7, 2008). "Apparent agency is essentially agency by estoppel; its creation and existence depend upon such conduct by the apparent principal as will preclude him from denying another's agency." West v. Methodist Hosp., 844 S.W.2d 642, 646 (Tenn. Ct. App. 1992).

"Agency must be proven by the party seeking to assert it, and the 'scope and extent of an agent's real and apparent authority' must 'be determined . . . from all the facts and circumstances in evidence.'" Farmers, 2013 WL 5424653 at * 5 (quoting, John J. Heirigs Const. Co., Inc. v. Exide, 709 S.W.2d 604, 608 (Tenn. Ct. App. 1986)). "'Generally, to prove apparent agency one must establish (1) the principal actually or negligently acquiesced in another party's exercise of authority; (2) the third person had knowledge of the facts and a good faith belief that the apparent agent possessed such authority; and (3) the third person relied on this apparent authority to his or her detriment.'" Boren v. Weeks, 251 S.W.3d 426, 432-433 (Tenn. 2008) (quoting Mechs. Laundry Serv. v. Auto Glass Co. of Memphis, 98 S.W.3d 151, 157 (Tenn. Ct. App. 2002)).

In an effort to establish that 1st Trust was Fidelity's agent for closings and escrow disbursements, BB&T first points to Fidelity's website which (at least in 2012) stated that. "[t]hrough its nationwide network of direct operations and agents, [Fidelity] provides title insurance, underwriting, escrow and closing services to residential, commercial and industrial clients[.]" At best, that statement suggests that Fidelity has the capacity to offer escrow and closing services nationwide, with the services being provided either directly through Fidelity or through a designated agent. It certainly does not say that each and every title agent for Fidelity is also a closing agent for Fidelity. In any event, this is what the website said in 2012. As BB&T admits it has no knowledge of what the website said in 2008, it could not have relied upon it.

BB&T next points to an alleged admission by Lee LaGraize, Fidelity's Rule 30(b)(6) representative, that Fidelity title agents regularly engage in closing loans. However, in his deposition, LaGraize merely conceded that the vast majority of title insurance agents also close loans, not that such agents close loans on behalf of Fidelity, let alone that 1st Title did so. Regardless, the deposition was taken long after the events at issue and so BB&T, again, could not have relied upon it in assuming that 1st Trust had authority to act as Fidelity's agent for purposes of loan closings.

BB&T also claims that a Tennessee statute "control[s]" this issue. (Docket No. 65 at 12. That statute reads:

> Every corporation complying with this chapter has, in addition to the powers and authority under its charter and existing laws applicable to the company, the following additional authority:
>> (1) To own, lease or construct abstract or title plants, and operate and maintain the same, and make, certify, guarantee and issue abstracts of title; and
>> (2) To act as escrow agent in connection with any transaction relating to the purchase, sale, exchange, lease, mortgage or other acquisition, disposition or encumbrance of property, real or personal, or any interest therein.

Tenn. Code Ann. § 56-35-103. Fittingly enough, that statute is titled "Powers of Title Companies" and merely provides the authority for title companies registered in this state to act as escrow agents. It cannot plausible be read to require that a title company underwriting a title policy must also be the one doing the closing.

Finally, BB&T asserts that "1st Trust, ostensibly to protect its principals, specifically requested the right to conduct disbursement in its capacity as 'title agent,'" and in support of this position cites an email from Thompson to Boykin where she wrote "'typically, in TN, since the title agent is responsible for seeing that all liens are paid in full, they handle all disbursements as well.'"

(Docket No. 65 at 13, citation omitted). However, it is equally plausible that Thompson was working to protect 1st Title in case it did not receive funds from the Borrower to pay off the Prudential Deed of Trust.

Moreover, and "'notably, 'a principal is responsible for the acts of an agent within his apparent authority only where the principal himself by his acts or conduct has clothed the agent with the appearance of authority, and not where the agent's own conduct has created the apparent authority.'" Thornton v. Allenbroke Nursing & Rehab. Ctr., LLC, 2008 WL 2687697 at *6 (Tenn Ct. App. 2008) (quoting Southern Ry. Co. v. Pickle, 197 S.W. 675, 677 (Tenn. 1917)). Thus, "[u]nder an apparent authority theory, in order for a principal to be bound by an agent, the third party's belief that the agent has such authority must be traceable to the principal's manifestation and cannot be established by the agent's acts, declarations, or conduct." Farmer, 2013 WL 5424653 at * 5.

Fidelity manifested its intention in the Issuing Agency Contract and clothed 1st Trust only with the authority to act "as a policy issuing agent of Principal for the sole purpose of issuing title insurance commitments, endorsements and other title assurances[.]" (Docket No. 63-2 at 60). Further, the Contract precluded 1st Trust from acting as Fidelity's agent at closings and, specifically did not allow 1st Trust to get involved in "the handling and disbursement of settlement funds or the providing of settlement services." (Id. at 62). While the Contract also contained language about the proper handling of money and closings because of Fidelity's concerns about potential liability claims, "a cardinal rule is that a court must attempt to ascertain and give effect to the intent of the parties," Chistenberry v. Tipton, 160 S.W.3d 484, 495 (Tenn. 2005) which is "presumed to be that specifically expressed in the body of the contract," Planters Gin Co. v. Fed. Compress & Warehouse

Co., 78 S.W.3d 885, 890 (Tenn. 2002).

Here, the intent of the parties could not be more clear: 1st Trust was an agent of Fidelity for purposes of issuing title insurance and related documents and was not its agent for closing and handling disbursements. Support for this conclusion can be found in 4-J LP v. Scarbrough & Weaver PLC, 2013 WL 411447 (Tenn. Ct. App. Jan. 31, 2013).

In 4-J LP, Weaver Title agreed to act as 4-J's agent in relation to the sale of three parcels of land. Weaver issued a title insurance policy for each parcel, underwritten by Chicago Title Insurance. The relationship between Weaver and Chicago Title was memorialized in a Issuing Agency Contract very similar to the one at issue here. Specifically, Weaver was appointed under the contract as an agent "for the sole purpose of issuing title insurance commitments, policies, endorsements, and other title assurances approved by" Chicago Title; the contract specifically provided that Weaver was not an agent for the purpose of conducting closings. Id. at **1 -2. Nevertheless, and like here, the contract stated that "because Principal may be subject to allegations of liability for acts of agent with regard to Agent's settlement or escrow business, Agent shall cooperate with Principal in the performance of audits of Agent's escrow record accounts and procedures." Id. at *2. And, like here, the contract also listed the duties of agents in relation to closing real estate transactions and the handling of funds.

Unbeknownst to Chicago Title, Weaver wired $400,000 of the loan proceeds into his personal E-Trade account, instead of using the money pay off a prior mortgage. 4-J then sued both Weaver and Chicago Title, but the trial court granted summary judgment in Chicago Title's favor finding that no reasonable minds could "differ as to a lack of apparent escrow agency" between Chicago Title and Weaver. Id. at *3.

In affirming that decision, the appeals court stated that a distinction must be made between an agent's "role as escrow agent and his role as title agent," and cited authority for the proposition that "although an issuing agent may wear 'two hats' in closing real property sales and selling title insurance, the title insurance company is not liable for the mishandling of real estate closing." Id. at *4. The appeals court also discussed closing protection letters ("CPLs"),[9] writing:

> A closing protection letter serves to provide some protection to the lender, and, "in its absence, a title insurer is not liable for the actions of its title insurance agent." Proctor v. Metro. Money Store Corp., 579 F. Supp. 2d 724, 738 (D. Md. 2008). Additionally:
>> A substantial majority of courts hold that if a title insurance company has not issued a closing protection letter, the title insurer has no liability for fraud or other misconduct by a settlement agent in connection with a real estate closing. Unless a lender's loss is covered by some provision of a title insurance policy, or unless a statute provides otherwise, the lender rather than the title insurer bears the risk of a loss caused by a settlement agent's misconduct.
> Id. (quoting James Bruce Davis, THE LAW OF CLOSING PROTECTION LETTERS, 36 TORT & INS. L.J. 845, 847 (2001) (footnotes omitted)).

Id. Finally, the appeals court wrote that "if 4–J really believed that Weaver was acting as Chicago's agent for escrow, settlement, or closing transactions, then it was obligated to ascertain the scope of that agency" because, "'[b]y undertaking to deal with a known or purported agent,'" a third person "is put upon inquiry as to the nature and scope of his powers, and must use due care to discover them or else suffer the consequences if they are exceeded.'" Id. (quoting Bells Banking Co., 938 S.W.2d at 426).

Likewise in this case, 1st Trust wore two hats, there was no CPL, and BB&T did not

---

[9] "A CPL offers lenders indemnification 'against damages arising out of certain claims which they may have against the agent of the title insurance company when a policy is to be issued, including protection against fraud and dishonesty of the issuing agent . . . in handling the lenders' funds or documents in connection with a closing.'" F.D.I.C. v. Prop. Transfer Svcs, Inc., 2013 WL 5535561 at *1 (S.D. Fla. Oct. 7, 2013) (citation omitted).

undertake to ascertain the scope of 1st Trust's authority. Summary judgment in favor or Fidelity is appropriate on BB&T's agency claims.

### 3. Claims directly against Fidelity for Fraud and Misrepresentation (the Second and Sixth Causes of Action)

In the Second Cause of Action, BB&T alleges that Fidelity committed fraud and misrepresentation through the issuance of the Marked Up Commitment, the Title Policy, and the Date Down Endorsements by representing to BB&T that the Prudential Deed of Trust had been satisfied or that necessary steps to accomplish that had been taken. The Sixth Cause of Action alleges that Fidelity made negligent misrepresentations based on the statements in those documents. In both counts, BB&T claims damages in the amount it funded – $17,546,659.31.

In Hodge v. Craig, 382 S.W.3d 325 (Tenn. 2012), the Tennessee Supreme Court stated that "'intentional misrepresentation,' 'fraudulent misrepresentation,' and 'fraud' are different names for the same cause of action," and suggested that the term "intentional misrepresentation" be "used exclusively" for such a claim. Id. at 342-43. "To recover for intentional misrepresentation, a plaintiff must prove: (1) that the defendant made a representation of a present or past fact; (2) that the representation was false when it was made; (3) that the representation involved a material fact; (4) that the defendant either knew that the representation was false or did not believe it to be true or that the defendant made the representation recklessly without knowing whether it was true or false; (5) that the plaintiff did not know that the representation was false when made and was justified in relying on the truth of the representation; and (6) that the plaintiff sustained damages as a result of the representation." Id. at 343. "Tennessee's courts have also recognized the common-law tort of negligent misrepresentation and have adopted the Restatement (Second) of Torts § 552 (1977) as the guiding principle with regard to these claims." Id. The Restatement

provides, in relevant part:

> (1) One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.

Restatement (Second) of Torts § 552 (1977) .

The Marked Commitment Letter cannot be the basis of a negligent or intentional misrepresentation claim because it did not make a representation of a present or past fact, nor supply false information.  Rather, that letter was a statement of the terms and conditions on which Fidelity was willing to issue a policy, with the relevant condition being that the Prudential Deed of Trust would be paid off at closing.  See Herrick v. Mike Ford Custom Bldg. LLC, 2001 WL 904299 at *2 (Tenn. Ct. App. 2001) ("[T]he Herricks' deposit becomes non-refundable upon the presentation of a loan commitment letter.  The agreement does not state that the loan commitment letter had to be free of conditions; rather, it simply says that upon presentment of loan commitment, the deposit becomes non-refundable."); Clardy Mfg. Co. v. Marine Midland Bus. Loans Inc.  88 F.3d 347, 358 (5th Cir. 1996) (statement in commitment letter was "not actionable as a misstatement of existing fact," rather, "at most [the] representation was a misstatement as to a future action").

The Title Policy also cannot be the basis for a misrepresentation claim because "'[a] title insurance policy is '. . . a contract to indemnify against loss caused by defects in the title or encumbrances on the title,'" and "'is not a representation that the title is in any particular condition.'" Lin v. Chicago Sun Title Ins. Co., 501 F. App'x 655, 656 (9th Cir. 2012) (quoting, Southland Title Corp. v. Superior Court, 282 Cal. Rptr. 425, 429 (Cal. App. 1991). "The 'promise'

made by the title insurer is no more than 'a promise to make the purchasers whole (up to the policy limits) for any defects in the title'" and "[t]o fulfill this promise, the title insurer must 'ma[ke] good the damage caused by the title defects by removing the defects.'" <u>United States v. Barrett</u>, 51 F.3d 86, 91 (7th Cir. 1995) (citation omitted). As the court pointed out in <u>4-J LP</u>, in the absence of a CPL, "the title insurer has no liability for fraud or other misconduct" and "the lender rather than the title insurer bears the risk of a loss caused by a settlement agent's misconduct." 2013 WL 411447 at *4.

As for the Date Down Endorsements, Fidelity argues that it cannot be liable for misrepresentation because (1) "BB&T asked for any additional matters of record since the date of the BB&T Policy"; and (2) "a Date Down Endorsement extends the effective date of the title policy and a new title search going forward from the date of the original title policy." (Docket No. 84 at 12). Fidelity also claims "[t]his is exactly what BB&T requested through its legal counsel" and received. (<u>Id</u>. at 12).

In the Court's opinion, the record is not clear as to what BB&T was seeking. In an email dated September 30, 2009, Boykin asked Thompson to "perform a date-down of the loan policy," indicating that "the Lender is *primarily* attempting to identify any outstanding claims of lien which may exist." (Docket No. 63-1 at 142) (emphasis added). Moreover, in the October 12, 2009, Endorsement, Fidelity ensured that "except as otherwise expressly provided herein, there are no liens, encumbrances or other matters shown by the public records, affecting said estate or interest, other than those shown in said policy[.]" (Docket No. 67-13 at 3). That said, the Endorsement also stated that it was a "[p]art of the policy," did not "modify any of the terms of the policy," and was "subject to all of the terms and provisions of the policy," (<u>id</u>.), which restricted "claims of loss or damages, whether or not based on negligence and which arise out of the status of the insured

mortgage" to the limitations set forth in the policy.  (Docket No. 1-13 at 5).

Given the present state of the record, the Court is not prepared to rule one way or the other as to whether Fidelity is liable for the misrepresentations in the Date Down Endorsements and, if so, to what extent.  The Court will hold a hearing so that counsel can address those matters.[10]

## IV.  CONCLUSION

On the basis of the foregoing, Fidelity's Motions to Strike will be denied.  Fidelity's Motion for Summary Judgment on the Contract Claims will be granted.  The Cross-Motions for Summary Judgment will be granted in favor of Fidelity, except with respect to the fraud and negligent misrepresentation claims based upon the Date Down Endorsement, on which Court will set a hearing.

An appropriate Order will be entered.

"

KEVIN H. SHARP
UNITED STATES DISTRICT JUDGE

---

[10]  In the criminal case arising from Lineberry's scheme, the Court was informed that TN Nashville, LLC had assumed the loan and that BB&T "had no remaining interest with respect to the recovery efforts," at least with respect to Thompson.  United States v. Thompson, 3:12-00025, Docket No. 75 at 2 (M.D. Tenn. Dec. 19, 2013).  This may raise a question about BB&T's continuing legal interest in this case, and the Court will hear from the parties on this issue as well.